**SO ORDERED: March 10, 2009.**



**James K. Coachys**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JANE MARIE NEAL, | ) | Case No. 06-07116-JKC-7A |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| DEAN TRENNEPOHL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No. 07-50316 |
| | ) | |
| JANE MARIE NEAL, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court on Plaintiff Dean Trennepohl's ("Plaintiff") Second Amended Objection to Discharge and Dischargeability and Complaint to Determine Dischargeability of Debt (the "Complaint") against Debtor/Defendant Jane Marie Neal ("Debtor). The Court conducted a trial on December 10, 2008 and then heard additional testimony on January 12, 2009. Having taken the matter under advisement, the Court now issues the following Findings of Fact and Conclusions of Law.

## Findings of Fact

1. Plaintiff holds a pre-petition judgment against Debtor. Debtor was once married to Plaintiff's brother and the judgment stems from a loan made by Plaintiff to his brother and Debtor so that they could purchase a home.

2. Debtor and her current husband, Gary Neal ("Neal"), first sought bankruptcy protection pursuant to a Chapter 13 petition filed on July 15, 2004, under Case No. 04-12819-FJO-13.

3. In October of 2004, Debtor, her three children by her previous marriage, and Neal moved into a home located at 3225 Hedback Way in Indianapolis, Indiana (the "Hedback Property") that was owned by Debtor's parents, George and Rosalie Snider (the "Sniders").

4. At Debtor's urging, the Sniders bought the Hedback Property with the proceeds from the sale of their previous residence and with the understanding that Debtor's family would reside in the home and help with the mortgage and other household expenses. The plan was ostensibly intended to help Debtor's family with their financial difficulties and to help Mrs. Snider care for her ailing husband.[1]

5. The Hedback Property cost approximately $725,000.00 and, with five bedrooms and seven bathrooms, was substantially more expensive than the Sniders' previous residence. At the time of the purchase, the Sniders were retired and on a fixed income of approximately $3,000.00 a month. To purchase the home, the Sniders executed a "no document" note and mortgage in excess of $500,000.00.

---

[1] Along with other medical problems, Mr. Snider suffered from an anaphylactic shock sometime in 2004 and was in poor health until his death in October of 2007.

6.     In November or early December of 2004, Debtor liquidated a 401k retirement account and received a check for $41,048.56 in net proceeds (the "Retirement Funds"),[2] which she then transferred to her parents' bank account.

7.     In her Chapter 13 case, Debtor exempted the retirement account on Exhibit C. In May of 2005, the Chapter 13 trustee conducted a Rule 2004 Exam of the Debtor regarding her liquidation of the account. Following the Rule 2004 Exam, the Debtor filed an amended plan that extended the duration of the plan from 42 to 60 months.[3]

8.     Debtor's father controlled her family's finances while they lived in the Hedback Property. Debtor's salary was deposited directly into her father's bank account, as was Neal's seasonal income and unemployment compensation.[4] Mr. Snider did not provide his daughter with an accounting of how he spent the Retirement Funds or the Neals' income.

9.     The Neals did not have a formal rental agreement with the Sniders, nor was there a formal agreement as to what expenses the Neals were to help pay or in what amount. It was Debtor's understanding, however, that the money was used to buy groceries, to service the sizeable mortgage on the Hedback Property and to pay utilities and other household expenses, including the children's parochial school tuition. Debtor's father also assumed responsibility for paying Debtor's Chapter 13 plan payments.

10.     Debtor's Chapter 13 case was involuntary dismissed on August 21, 2006, after she

---

[2] In a deposition taken on October 11, 2004, Debtor indicated that she had already taken approximately $10,000 from the account in December of 2003.

[3] Debtor's monthly plan payment was $500.00.

[4] Combined, the Neals made approximately $3,000.00 per month.

3

stopped making plan payments in the spring of 2006.[5] Following dismissal, the Chapter 13 trustee returned $8,390.15 in undistributed plan payments to Debtor (the "Returned Funds").

11. Debtor's family lived in the Hedback Property until November of 2006.

12. In February of 2007, the Sniders filed a Chapter 7 bankruptcy petition and were forced to abandon the Hedback Property. The records in the Sniders' bankruptcy indicate that they stopped making mortgage payments on the Hedback Property in August of 2006.

13. Mr. Snider passed away on October 12, 2007, after spending two months in intensive care.

14. Debtor filed a voluntary Chapter 7 petition on November 8, 2006. Debtor and Neal are currently separated and, as of the December 10, 2008 trial in this proceeding, Debtor was unemployed.

## Conclusions of Law

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

2. Per his Amended Complaint, the Plaintiff sought relief under 11 U.S.C. §§ 727(a)(2), (a)(3), 727(a)(4)(A), (a)(5) and (a)(7). Subsequent to trial, Plaintiff conceded that the evidence does not support his claims under §§ 727(a)(2) and (a)(7). Those claims related specifically to the Returned Funds. What remains are Plaintiff's claims under §§ 727(a)(3), (a)(4)(A), and (a)(5), which specifically relate to the Retirement Funds.

3. The Court begins its discussion with Plaintiff's claim under § 727(a)(4)(A). In relevant part, that provision provides that the Court will deny a debtor a discharge if the debtor

---

[5] The Chapter 13 trustee moved to dismiss the case on May 11, 2006.

4

"knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." In order for this section to preclude discharge, the Plaintiff must establish by a preponderance of the evidence that: (1) Debtor made a statement under oath; (2) the statement was false; (3) Debtor knew the statement was false; (4) Debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *See, e.g., Lee Supply Corp. v. Agnew (In re Agnew* ), 818 F.2d 1284, 1289-90 (7th Cir.1987).

4.  To find the requisite degree of fraudulent intent, the court must find that the debtor knowingly intended to defraud or engaged in such reckless behavior as to justify a finding of fraud. *In re Yonikus,* 974 F.2d 901, 905 (7th Cir.1992). Direct evidence of intent to defraud may not be available. *In re Costello,* 299 B.R. 882, 900 (Bankr.N.D.Ill.2003). Instead, intent may be inferred from circumstantial evidence or by inference based on a course of conduct. *See Yonikus,* 974 F.2d at 905. Reckless disregard means "not caring whether some representation is true or false . . . ." *In re Chavin,* 150 F.3d 726, 728 (7th Cir.1998). If a debtor's bankruptcy schedules reflect a "reckless indifference to the truth" then the plaintiff seeking denial of the discharge need not offer any further evidence of fraud. *Costello,* 299 B.R. at 900.

5.  For such a false oath or account to bar a discharge, the false statement must be "material." *In re Olson*, 916 F.2d 481, 484 (8th Cir.1990). "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Id*.

6.  Here, Debtor did not initially disclose that she had cashed out her retirement account on the Statement of Affairs for her 2006 Chapter 7 bankruptcy case (the "SOFA"). After Plaintiff

5

initiated this adversary proceeding, Debtor filed an amended SOFA on June 22, 2007, showing that she received the Retirement Funds as income within two years of the bankruptcy filing and that she transferred the Retirement Funds to her father.

7. There is no question that the receipt and transfer of the Retirement Funds was "material." There is also no question that Debtor's SOFA was false. Therefore, the dispositive question before the Court is whether Debtor, by omitting the information from the SOFA, intended to defraud her estate or exhibited a reckless disregard for the truth such that she should be denied a discharge.

8. Debtor testified that she failed to list the receipt or transfer of the Retirement Funds in her SOFA because she "thought it was all done and over with." In other words, Debtor was under the belief that the matter had already been resolved in her previous Chapter 13 case.

9. Debtor's argument is a difficult one to resolve. Because of the 2004 Exam conducted by the Chapter 13 trustee in May of 2005, Debtor arguably should have assumed that the Retirement Funds were a potential issue in her Chapter 7 case. Certainly, the questions posed by the SOFA do not suggest that a debtor may omit information merely because it was disclosed in a prior case.

10. Other factors, however, militate against a conclusion that Debtor acted fraudulently or recklessly. Certainly, Plaintiff was already well aware that Debtor had liquidated her retirement account. Plaintiff stood to gain very little, if anything, by omitting that information from her SOFA, and it is not clear how Plaintiff, or any other party, was harmed by the omission. There is also nothing in the record to suggest that Debtor's schedules contain other errors or omissions or that she otherwise exhibited a reckless indifference to the veracity of her bankruptcy petition.

11. Giving Debtor the benefit of the doubt, the Court cannot conclude that she acted with

the fraudulent intent required by § 727(a)(4)(A). The Court, therefore, denies Plaintiff's claim for relief under that provision.

12. Plaintiff also seeks relief under § 727(a)(3). That provision provides that the Court will grant a debtor a discharge, unless–

> [T]he debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the debtor's financial condition or business transactions might be ascertained unless such act or failure to act was justified under all of the circumstances of the case.

13. Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Matter of Juzwiak*, 89 F.3d 424, 428 (7th Cir.1996) (citations omitted). This provision ensures that trustees and creditors will receive sufficient information to enable them to "trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions." *Id*. Records need not be kept in any special manner, nor is there any rigid standard of perfection in record-keeping mandated by § 727(a)(3). *Id.* On the other hand, courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs. *Id.*

14. Based on these principles, the Court cannot conclude that Debtor has met her burden to keep or preserve sufficient recorded information from which to ascertain her financial condition or business transactions. Nor can the Court conclude that such failure was justified under all of the circumstances of this case.

15. The only documentation before the Court regarding disposition of the Retirement

Funds is a deposit slip showing that the money was placed into the Sniders' bank account. Debtor kept no record of how or when the Retirement Funds were spent, if at all.

16. According to his wife's testimony, Mr. Snider was in very poor health by the time they purchased the Hedback Property, a house they clearly could not afford on their fixed income. Mrs. Snider also testified that they had mounting medical bills. Despite this, Debtor decided to turn over her family's finances to her father without any formal agreement or oversight. At best, that decision can be viewed as a desperate attempt to save her family from financial ruin.[6] At worst, it suggests that Debtor was all too eager to simply wash her hands of her financial situation.

17. While Debtor's abdication of her family's finances may have been an acceptable solution to her and her family, it is not acceptable to the Court. Debtor had some duty under the Code to track how the Retirement Funds were spent or, in the very least and as explained more fully below, to substantiate her testimony through her father's financial records.

18. Plaintiff's claim under § 727(a)(3) is closely related to his claim under § 727(a)(5), and it bears discussing both provisions in tandem. Under § 727(a)(5), a debtor may be denied a discharge if he or she "fail[s] to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." A bankruptcy court has "broad power to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re D'Agnese,* 86 F.3d 732, 734 (7th Cir.1996) (quoting *In re Martin,* 698 F.2d 883, 886 (7th Cir.1983)).

19. The creditor has the initial burden of establishing that there has been a loss or

---

[6] If this was indeed the case, the Court simply cannot understand why Debtor encouraged her parents to buy the Hedback Property.

8

disappearance of assets; then, the burden shifts to the debtor to satisfactorily explain the loss of assets. *Martin*, 698 F2d at 886. A satisfactory explanation of a loss of assets " 'must consist of more than ... vague, indefinite, and uncorroborated' assertions by the debtor." *D'Agnese,* 86 F.3d at 734 (quoting *Baum v. Earl Millikin, Inc.,* 359 F.2d 811, 814 (7th Cir.1966)).

20. Plaintiff has met its burden in showing that there has been a loss of assets as the evidence clearly indicates that Debtor no longer has the Retirements Funds.

21. As indicated above, the only evidence before the Court regarding the disposition of the Retirement Funds is a deposit slip showing that the money was transferred to Sniders' bank account. Not only did Debtor not maintain her own financial records, but she also failed to produce any of her parents' financial records, including bank statements for the account in which the Retirement Funds were deposited.

22. Debtor, Mrs. Snider and Neal all testified to their understanding that the Retirement Funds were used to pay various household expenses. No matter how sincere that testimony may have been, their understanding is based on nothing more than conjecture, as all three admitted that they were not privy to Mr. Sniders' finances or financial records.

23. There is no question that both the Neals and Sniders needed help with their household expenses while living in the Hedback Property. However, in the absence of any documentation, there is simply no evidence before the Court showing that the Retirement Funds were exclusively or entirely used to pay such expenses.

24. The Court simply cannot conclude that Debtor's vague and unsubstantiated statements–that were corroborated only by her mother and husband's equally vague and unsubstantiated statements–satisfactorily explain the loss of the Retirement Funds.

25. While the Court sympathizes with Debtor's predicament and questions whether Plaintiff's efforts to preserve his claim against her will be in vain, it must conclude that Debtor has not met her burden under either §§ 727(a)(3) or (a)(5). The discharge is, therefore, denied.

## Conclusion

Based on the above findings of fact and conclusions of law, the Court concludes that Debtor is not entitled to a discharge under §§ 727(a)(3) or (a)(5). The Court will issue a Judgment Order consistent with these findings and conclusions contemporaneously herewith.

###

Steven P. Taylor
Keith E. Gifford
Paul Ludwig